## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CHRISTOPHER IHEBEREME,         )
                                    )

           Plaintiff,         )
                                    )

          v.               )       Civil Action No. 10-1106 (ESH)
                                    )

CAPITAL ONE, N.A.,            )
as successor by merger to      )
CHEVY CHASE BANK, F.S.B., et al.,  )
                                    )

          Defendants.    )
_____ )

## <u>MEMORANDUM OPINION</u>

Christopher Ihebereme is the mortgagor of a $280,000 home mortgage loan currently held by Chevy Chase Bank, F.S.B. ("Chevy Chase"). After Chevy Chase asserted that he had defaulted on his debt, Ihebereme sued Chevy Chase and its successor by merger, Capital One, N.A. ("Capital One"); and Capital One's Vice President, Kate Stone. Plaintiff filed his Amended Complaint in the Superior Court of the District of Columbia, claiming breach of contract, tortious interference with contract, breach of the contractual duty of good faith and fair dealing, fraud, violation of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C. Code §§ 28-3901 to -3913, violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402-1, intentional infliction of emotional distress, and defamation of character. Defendants have removed the case to this Court on the basis of diversity of citizenship[1] and have moved to

---

[1] As this case is before the Court pursuant to diversity jurisdiction, the law of the District of Columbia shall govern all substantive issues. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995); *see also Schleier v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 876 F.2d 174, 180 (D.C. Cir. 1989) ("Although the Rules of Decision Act, and hence *Erie R.R. v. Tompkins* [304 U.S. 64 (1938)], do not strictly apply with respect to

1

dismiss the Amended Complaint.  For the reasons stated herein, defendant Capital One N.A.'s motion will be granted in part and denied in part, and defendant Kate Stone's motion will be granted.


## BACKGROUND

On March 28, 2007, Chevy Chase issued to plaintiff a $280,000 mortgage[2] for plaintiff's purchase of a home in the District of Columbia.  (Am. Compl. ¶¶ 13-14, 16.)  The mortgage called for interest at an annual percentage rate of 6.797% and repayment over 360 months.  (*Id.* ¶ 16.)  According to the terms of his mortgage, plaintiff was required to make monthly payments of $2,469.89.  (*Id.* ¶ 18.)  Chevy Chase charges a fee of ninety dollars for late payments (*id.* ¶ 25) and a service charge of approximately twenty-five dollars for payments made by telephone.  (*Id.* ¶ 27.)

The mortgage also required monthly payments of $406.09 for private mortgage insurance ("PMI"), waivable if plaintiff made twelve consecutive monthly payments not more than thirty days past due *and* twenty-four consecutive monthly payments not more than sixty days past due. (*Id.* ¶¶ 65-66.)  According to plaintiff, Chevy Chase substantially overcharged him for PMI, based on its calculation of plaintiff's premium; plaintiff insists that the actual amount he should have been charged monthly under a standard formula for a PMI premium is $210 per month.  (*Id.* ¶¶ 72-79.)  This overcharge, plaintiff alleges, amounts to fraud, a material misrepresentation, and an unfair business practice.  (*Id.* ¶¶ 80, 86.)

For the first ten months of the mortgage term, plaintiff made his monthly payments on

---

D.C. law, we apply D.C.'s substantive law analogously for reasons of uniformity and respect for the D.C. Court of Appeals.") (citation omitted).

[2] Plaintiff's nephew signed the loan along with the plaintiff, but he is not a party in this lawsuit.  (Am. Compl. ¶ 15.)

time and without incident, using Chevy Chase's Internet-based medium for bill payment. (*Id.* ¶ 22.) When plaintiff attempted to make his March 2008 payment using the same online service, he found that Chevy Chase had stopped accepting his online payments. (*Id.* ¶ 23.) Almost immediately, plaintiff's relationship with Chevy Chase began to deteriorate, as he sought an explanation for the change but received none, began to incur late fees for rejected payments, and lost his good standing for timely payments. (*Id.* ¶¶ 24-26.) Chevy Chase first notified plaintiff that he must pay either over the telephone (and incur a service charge) or in-person to a bank teller, and subsequently, that instead of a bank teller, he must thenceforth pay a branch manager directly. (*Id.* ¶¶ 27-29.) Owing to the newfound inconveniences related to his mortgage payments, plaintiff alleges that his job performance was interrupted and he was fired. (*Id.* ¶¶ 32(e), 33.)

Plaintiff also alleges that three consecutive mortgage payments, which he made under the changed requirements, were not credited in a timely fashion, resulting in a declaration of default, the commencement of foreclosure proceedings, and false reports of default to credit bureaus. (*Id.* ¶ 32(f)-(g).) The foreclosure proceedings and false reports of default—including in notices sent to plaintiff's household—caused plaintiff's family to distrust him and caused him embarrassment in his community. (*Id.* ¶¶ 35-37.) Moreover, according to plaintiff, this prevented him from refinancing the mortgage, in turn keeping him from recovering his credit. (*Id.* ¶ 32(h).)

Plaintiff, initially proceeding *pro se*, filed his Complaint in the Superior Court of the District of Columbia on March 25, 2010, seeking thirteen million dollars in damages. (Compl. ¶¶ 479-80.) Defendants moved to dismiss the Complaint, and, with the court's leave, plaintiff obtained counsel and filed an Amended Complaint on May 28, 2010. (*See* Am. Compl.; Order

of May 24, 2010.)  Plaintiff's Amended Complaint pleads twelve claims, of which nine are

against Capital One, four are against Chevy Chase, and three are against Stone.  He seeks

declaratory and injunctive relief in addition to unspecified money damages.  (Am. Compl. ¶

126.)

On June 17, 2010, defendants moved to dismiss the Amended Complaint (Mot. of Def.

Capital One to Dismiss Am. Compl. ["Capital One Mot."]; Mot. of Def. Stone to Dismiss Am.

Compl. ["Stone Mot."]), and on June 25, 2010, defendants removed the case to this Court on the

basis of diversity of citizenship.


**ANALYSIS**

**I.      STANDARD OF REVIEW**

In deciding a motion to dismiss for failure to state a claim upon which relief can be

granted, under the Federal Rules of Civil Procedure, a court may consider only "the facts alleged

in the complaint, any documents either attached to or incorporated in the complaint and matters

of which [the Court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117

F.3d 621, 624 (D.C. Cir. 1997).  As the Supreme Court held in *Ashcroft v. Iqbal*, "[t]o survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must be dismissed if it consists only

of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements."  *Id.*  "Although 'detailed factual allegations' are not necessary to withstand a Rule

12(b)(6) motion to dismiss, to provide the 'grounds' of 'entitle[ment] to relief,' a plaintiff must

furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of

action.'" *Gerlich v. Dep't of Justice*, 659 F. Supp. 2d 1, 4 (D.D.C. 2009) (quoting *Twombly*, 550 U.S. at 555-56).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). The allegations in plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). "However, the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II.    PLAINTIFF'S CLAIMS

### A.    Breach of Contract

#### 1.    Chevy Chase

Plaintiff alleges that Chevy Chase breached its contract with plaintiff by successively limiting the methods of payment available to plaintiff. Chevy Chase counters that the Amended Complaint does not adequately allege that any contractual duty was breached. Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a short and plain statement of the grounds upon which the court's jurisdiction depends, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks. Fed. R. Civ. P. 8(a). The purpose of the minimum standard of Rule 8 is to give fair notice to the defendants of the claim being asserted, sufficient to prepare a responsive answer, to prepare an adequate defense and to determine whether the doctrine of *res judicata* applies. *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977).

In the case of a claim for breach of contract, the complaint must allege four necessary elements in order to effect fair notice: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsinolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009); *see San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (finding that a plaintiff "must allege and establish" all four elements to recover). Obviously, one cannot breach a contract without breaching a particular obligation created under the contract, and thus, "in the absence of a contractual obligation . . . defendants could not have breached their contract." *Schoen v. Consumers United Group, Inc.*, 670 F. Supp. 367, 378 (D.D.C. 1986).

In this case, plaintiff's claim for breach of contract consists of several factual allegations: that he and Chevy Chase signed a contract, that Chevy Chase at first accepted on-line payments and then refused to continue accepting them, that at some point Chevy Chase came to require that plaintiff pay either by telephone or in-person to a bank teller, and that eventually Chevy Chase came to require that he pay a branch manager directly. (Am. Compl. ¶¶ 13-29.) Those allegations include the existence of a contract (*id.* ¶¶ 13-19), suggestions that Chevy Chase was breaching *something* (*id.* ¶¶ 23-24, 27, 29), and an assertion of financial injury caused by the bank's behavior. (*Id.* ¶¶ 25-26.) But conspicuously absent from the narrative is any allegation as to the existence of any duty relevant to the breach claimed.

Plaintiff's failure to allege that Chevy Chase was under a contractual duty to accept payment online when it notified him that he must instead pay in-person, or to accept payments at the teller window when it instead required payment to a branch manager, represents a critical gap in his claim. The conclusory assertion that "Chevy Chase violated the terms of the contract between Plaintiff and Defendant" (Am. Compl. ¶ 30) does not put defendant on notice of *which*

terms it allegedly breached, so the allegation does not satisfy the notice-pleading purpose of Rule 8's requirement for a plain statement of the claim.  Moreover, the section of the contract excerpted by plaintiff in his Amended Complaint (*see* Am. Compl. ¶ 19) does not appear to impose a duty on the bank to accept any particular form or method of payment, and plaintiff neglects to explain anywhere else in his Amended Complaint whether one might infer a duty from that section.  Moreover, the Court has reviewed the contract (Am. Compl., Ex. 1 ["Deed of Trust"]) in its entirety and can find neither an express duty for Chevy Chase to accept mortgage payments through any particular means, to any particular person, or at any particular location, nor any constraint on the bank's power to limit plaintiff's method of payment.[3]

Without a contractual duty, there can be no breach of contract, and by not identifying any duty under the contract to forbear from taking any of the actions alleged, plaintiff has not stated a claim for breach of contract.

### 2. Capital One

Plaintiff alleges that Capital One breached a contract "[b]y failing to investigate the allegations of Plaintiff" (*id.* ¶ 117) and by "condon[ing] the acts and omissions of Defendants Stone and Chevy Chase."  (*Id.* ¶ 118.)  Capital One maintains that plaintiff has failed to allege a breach of any contractual obligation.  The Court agrees for the reasons set forth above.  Plaintiff

---

[3] The only clearly relevant contractual obligations upon the lender are notice requirements setting out how the bank must communicate with plaintiff.  (Deed of Trust at 10 ("in writing," "mailed by first class mail or . . . actually delivered," and so on).)  Those terms are incorporated by reference as the method by which to notify plaintiff of changes to the location where he must send his mortgage payments.  (*Id.* at 4.)  Plaintiff does not dispute Chevy Chase's method of notice, so this contractual duty appears to have been satisfied.

The Court also notes that while these requirements impose a duty on the bank to *notify* plaintiff of changes, they do not require the bank to *justify* such changes.  (*Id.* at 10.)  Plaintiff's Amended Complaint includes in its claim for breach of contract against Chevy Chase allegations that the bank refused to justify or explain changes (Am. Compl. ¶¶ 24, 27, 29), but unless plaintiff alleges that the bank owed him an explanation pursuant to contract (which he does not), the facts pleaded do not amount to a breach of contract.

has not alleged that Capital One is bound by a contractual duty to investigate his grievances or to prevent Stone and Chevy Chase from acting in any particular manner. Thus, he has failed to state a claim upon which relief can be granted.

**B.      Tortious Interference With Contract**

Plaintiff alleges that Stone and Chevy Chase "interfered with [his] implementation of and compliance with" the requirements of the loan agreement between him and Chevy Chase. Defendants respond by arguing that, as a party to the contract, they cannot be liable for having interfered therewith. The Court agrees and will dismiss the tortious interference claims.

The District of Columbia adheres to the "rule that 'the defendant's breach of his own contract with the plaintiff is of course not a basis for the tort' of interference with contractual relations." *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991) (quoting W. Prosser & W.P. Keeton, Prosser on Torts, § 129 at 900 (5th ed. 1984)). The court in *Raskauskas* explained the rule as "stem[ming] from the common sense notion that a plaintiff should not be allowed to convert a breach of contract claim into a claim for tortious interference." *Id.* By the same reasoning, the D.C. Court of Appeals has held that when a corporation is a party to a contract, its officers, "acting as agents of the . . . party to the contract . . . through their actions could not tortiously interfere with [the corporation's] own contract." *Press v. Howard Univ.*, 540 A.2d 733, 736 (D.C. 1988).

Defendants here are a corporation and its Vice President. One is a party to the contract and the other is its officer acting as an agent of the party to the contract. Plaintiff's Amended Complaint acknowledges that one defendant is a party to the contract (Am. Compl. ¶ 32) and that the other is an officer "at all times material . . . in a position to make, implement and/or enforce policies of" the party. (Am. Compl. ¶ 41; *see* Mem. of P. &. A. in Supp. of Mot. of Def. Stone to

Dismiss Am. Compl. ["Stone MPA"] at 5.)  Neither, therefore, can be liable under D.C. law for tortious interference with the corporation's contract with plaintiff, and Counts II and III will be dismissed.

### C.       Breach of Good Faith and Fair Dealing

Plaintiff alleges that Chevy Chase breached its implied covenant of good faith and fair dealing in several ways: by making it difficult for plaintiff to pay his mortgage bills (Am. Compl. ¶ 63(a), (d)), by not crediting the payments he made (*id.* ¶¶ 63(b), 68), and by erroneously reporting non-payment to credit bureaus.  (*Id.* ¶ 63(c).)  Chevy Chase seeks to dismiss these claims on the grounds that it was acting within its express contractual rights.  Under the law of the District of Columbia, "all contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)).  "This duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance."  *Hais*, 547 A.2d at 987-88.

Chevy Chase argues that it had an express right under its contract with plaintiff to undertake each act that plaintiff complains about.  (Mem. of P. & A. in Supp. of Mot. of Def. Capital One to Dismiss Am. Compl. ["Capital One MPA"] at 7-8.)  As a preliminary matter, while plaintiff argues that the conduct was "expressly permitted by the contract" (*id.* at 8), express rights to undertake the acts alleged are nowhere in the contract.  The Deed of Sale fails to give defendant any right to engage in the alleged behavior.  Defendant's brief does not indicate where it claims that right exists (even though both parties quote from the contract in

their briefs, and it was attached as an exhibit to the Amended Complaint), nor can the Court find any such provision in the Deed of Sale.

But even if such express contractual permission could be found, satisfaction of the implied covenant of good faith and fair dealing requires more than a showing that the contract conferred discretion, for such discretion must be exercised *reasonably*. *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999). In other words, defendant "would not have breached its duty of fair dealing when reasonable persons in the parties' shoes would have expected the contract to be performed as it was." *Id.* at 90-91. The behavior as alleged, however, does not represent an expected or reasonable exercise of a lender's contractual discretion, even if that discretion is clearly vested in the lender. Plaintiff avers as much, by calling the behavior "arbitrary" and "capricious." (*E.g.*, Am. Compl. ¶ 67.)

The conduct alleged, (*i.e.*, refusing to accept and credit payments and providing false reports to credit bureaus) is not provided for in the contract, and that behavior arguably diminished plaintiff's ability to "receive the fruits of the contract," *see Paul*, 754 A.2d at 310, by making it more difficult for him to repay the mortgage as a result of late fees and the decreased accessibility of refinancing. Plaintiff therefore has sufficiently alleged activity that "evad[es] the spirit of the contract" and "interfer[es] with the other party's performance." *See Hais*, 547 A.2d at 987-88. The Court accordingly denies the motion to dismiss plaintiff's claims for breach of Chevy Chase's duty of good faith and fair dealing.

### D.     Fraud

Plaintiff claims that Chevy Chase defrauded him by overcharging for PMI. Fraud claims are subject to rigorous requirements, both in terms of the necessary elements and the heightened standard to satisfy those elements. "'The essential elements of common law fraud are: (1) a false

representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.'" *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002) (quoting *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977)). Both D.C. and federal pleading standards require a plaintiff claiming fraud to allege specific facts lending themselves to an inference of fraud. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Bennett*, 377 A.2d at 59-60 ("One pleading fraud must allege such facts as will reveal the existence of all the requisite elements of fraud.").

Plaintiff's fraud claim here does not even purport to allege the necessary elements of knowledge and intent.[4] Thus, while intent and knowledge may be alleged generally, *Scowcroft Group, Inc. v. Toreador Res. Corp.*, 666 F. Supp. 2d 39, 45 (D.D.C. 2009), and while a mere assertion of knowledge has been found to meet the standard, *Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 288 (D.D.C. 2005), the Amended Complaint does not even clear those low bars. Due to plaintiff's failure to allege the knowledge and intent elements, a claim for relief has not been stated with respect to fraud.

### E.    DCCPPA

Plaintiff claims that both Chevy Chase and Capital One engaged in unlawful trade practices under the DCCPPA. According to defendant, the DCCPPA does not apply to this case for two reasons. First, defendant argues that the behavior which underlies this case "does not involve the sale, lease, or transfer of consumer goods or services," and thus, the particular

---

[4] With regard to his fraud claim, plaintiff urges a lenient interpretation of the pleading requirements, recalling that "the purpose of notice pleading is to put the other party on notice of the claim." (Pl.'s Opp'n at 5.) But an action for fraud requires more than typical notice; its heightened requirements are memorialized in Rule 9(b), and the liberal notice-pleading standard of Rule 8(a)(1) is not applicable.

financing-related practices at issue in the Amended Complaint are not subject to the DCCPPA. (Capital One MPA at 10-11.) Second, defendant asserts that, because "[t]he acts of which plaintiff complains all occurred subsequent to the sale of consumer services," those acts are not part of the sale itself and therefore do not fall within the statute's authority. (*Id.* at 11.) Plaintiff disputes both points, arguing that although the case law does not provide a clear answer, it is "difficult to believe that such a comprehensive act" would not apply here. (Pl.'s Opp'n at 6.)

"The purpose of the [DCCPPA] is to protect consumers from a broad spectrum of unscrupulous practices by merchants, therefore the statute should be read broadly to assure that the purposes are carried out." *Modern Mgmt. Co. v. Wilson*, No. 08-CV-18, 2010 WL 2194436, at *18 (D.C. June 3, 2010). Specifically, the DCCPPA regulates transactions between a consumer and a merchant. D.C. Code § 28-3904; *see Indep. Commc'ns Network, Inc. v. MCI Telecomms. Corp.*, 657 F. Supp. 785, 787 (D.D.C. 1987). The Court observes that the DCPPA is, "to say the least, an ambitious piece of legislation," *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 708 (D.C. 1981), "with broad remedial purposes." *DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 703 (D.C. 1999); *see* D.C. Code § 28-3904(b). It "prohibit[s] a long list of 'unlawful trade practices,'"[5] *Howard,* 432 A.2d at 708, and to do so it defines the operative terms broadly, in accordance with its goal of "assur[ing] that a just mechanism exists to remedy *all* improper trade practices." D.C. Code § 28-3901(b)(1) (emphasis added).

Under the DCCPPA, a "consumer" is "a person who does or would purchase, lease (from), or receive consumer goods or services, . . . or a person who does or would provide the

---

[5] The underlying claim that Chevy Chase's practices were unlawful under DCCPPA is not at issue for the purpose of defendants' motion to dismiss. The only basis asserted by defendants for dismissal of the DCCPPA claim is that the statute does not extend to the transaction and behavior at issue. (*See* Capital One MPA at 10-11.) Therefore, the Court need not address either the boundaries of "unlawful trade practices" under the act or their relationship to defendants' acts.

economic demand for a trade practice." D.C. Code § 28-3901(a)(2). A "merchant" is "a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." *Id.* § 28-3901(a)(3). The Act defines a "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease, or transfer of consumer goods or services." *Id.* § 28-3901(a)(6). Finally, "goods and services" are defined broadly as "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." *Id.* § 28-3901(a)(7). A merchant need not be the "actual seller of the goods or services" complained of, but must be "connected with the 'supply' side of the consumer transaction." *Save Immaculata/Dunblane, Inc. v. Immaculata Prep. Sch.*, 514 A.2d 1152, 1159 (D.C. 1986).

The question of the DCCPPA's applicability to mortgage transactions was first presented in *DeBerry v. First Gov't Mortgage & Investors Corp.*, 170 F.3d 1105 (D.C. Cir. 1999). Seeking to apply local D.C. law and noting that local D.C. courts had "not ruled directly on this issue," the D.C. Circuit certified the following question to the D.C. Court of Appeals: "Does [the DCCPPA] apply to real estate mortgage finance transactions?" *Id.* at 1110. The D.C. Court of Appeals responded as follows:

> In the [DCCPPA], the Council [of the District of Columbia] declared its opposition to unconscionable credit transactions exploiting a consumer's likely inability to make payment in full or otherwise protect her interests. The mischief represented by that practice obviously exists whether mortgage financing accompanies the sale of property or is itself the subject matter of the transaction. . . . We therefore hold that [the DCCPPA] applies to real estate mortgage finance transactions.

*DeBerry*, 743 A.2d at 703 (D.C. 1999)).  Since then, courts have consistently treated mortgagees'

practices as subject to the DCCPPA.  *See, e.g.*, *Williams v. First Gov't Mortgage & Investors

Corp.*, 225 F.3d 738, 744 (D.C. Cir. 2000); *Hughes v. Abell*, 634 F. Supp. 2d 110, 113 (D.D.C.

2009); *Johnson v. Long Beach Mortgage Loan Trust 2001-4*, 451 F. Supp. 2d 16, 38 (D.D.C.

2006).

Defendant argues, however, that the DCCPPA's interdiction of unconscionable credit

practices and other unfair trade practices does not apply to this case because the challenged

behavior occurred *after* the sale of the loan.  By occurring after the signing of the Deed of Trust,

according to defendant, the behavior is excluded from the DCCPPA's definition of "trade

practices."  (*See* Capital One MPA at 11.)  For the Court to be persuaded by this argument, it

must find that *none* of the challenged behavior "create[d], alter[ed], repair[ed], furnish[ed],

ma[d]e available, provide[d] information about, or, directly or indirectly, solicit[ed] or offer[ed]

for or effectuate[d]" the sale of the mortgage.  *See* D.C. Code § 28-3901(a)(6).  Such a finding is

not appropriate at this stage, in light of the facts alleged by plaintiff.

Neither party provides case law discussing temporal constraints on the acts related to a

sale under the statute.  Whether a mortgagee's acts over the period of the mortgage loan

constitute acts that, for example, alter or effectuate or provide information about the sale of the

mortgage under the DCCPPA is unclear.  While many authorities have opined divergently on

what constitutes a sale,[6] the contours of acts altering or effectuating or providing information

---

[6] As the Supreme Court has noted, "[w]here Congress uses terms that have accumulated
settled meaning under either equity or the common law, a court must infer, unless the statute
otherwise dictates, that Congress means to incorporate the established meaning of these terms."
*NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981).  As the D.C. courts have not adopted any
countervailing canon for the construction of the D.C. Code, the Court will assume that the
common law's definition of sale prevails insofar as defining the sale itself is helpful for

about a sale are necessarily more inclusive than the sale itself, in terms of, *inter alia*, the time horizons and the parties involved. For example, even when "parties providing recommendations of the goods or services of a particular merchant to the consumer" are not parties to the sale, and even when their acts take place before the sale itself, such parties may nonetheless "assume liability" under the "broad reach of the DCCPPA." *Adler v. Vision Lab. Telecomms., Inc.*, 393 F. Supp. 2d 35, 39-40 (D.D.C. 2005). Accordingly, the Court will not disqualify behavior falling outside of – or after – the act of signing the contract from the DCCPPA's purview.

Even if acts after the March 28, 2007 signing of the Deed of Trust and Promissory Note were not subject to the DCCPPA, plaintiff would still state a valid claim for relief under the statute. At least one of the challenged acts happened even before the parties inked their contract—the alleged misrepresentation of material facts which plaintiff argues Chevy Chase undertook by misrepresenting the PMI premium. So even if the sale had ended when the parties signed the Deed of Trust, as defendant suggests, this alleged material misrepresentation predated the conclusion of the sale. Thus, defendant's factual assertion that "[t]he acts of which plaintiff complains all occurred subsequent to the sale of consumer services to plaintiff" (Capital One

---

analyzing the underlying question (of when a party's acts can no longer alter or effectuate a sale).

At least two definitions of property have guided the common law in this country: "Blackstone defines a sale to be 'a transmutation of property from one man to another in consideration of some price.' 2 Bl. 446. And Kent says 'a sale is a contract for the transfer of property from one person to another for valuable consideration.'" *Iowa v. McFarland*, 110 U.S. 471, 488 (1884). A definition such as Blackstone's, that focuses on the transfer of property may include the entire mortgage loan period; although property has already been transferred (in the form of cash, financing, and a security interest in the home) much of the property transfer involved in the mortgage remains to be undertaken until the mortgage is repaid. A definition such as Kent's, on the other hand, that focuses on the contract for transfer rather than the transfer itself, suggests an end-point to the sale when the contract is signed. The Supreme Court appears to have settled on Blackstone's transfer-based understanding of a sale, by concluding that "[a] sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent." *McFarland*, 110 U.S. at 478, *quoted in Coltec Indus., Inc. v. U.S.*, 62 Fed. Cl. 716 (Fed. Cl. 2004).

MPA at 11) cannot be correct, even under an interpretation of the timing of sale most favorable to them.

Plaintiff alleges that defendant misrepresented material facts, refused to credit his timely and good-faith payments, changed his payment requirements without explanation, and generally engaged in improper trade practices. Questions may remain as to whether the behavior transpired as plaintiff alleges and whether it violates the DCCPPA, but at this juncture, the Court is satisfied that the allegations state a claim upon which relief can be granted and therefore the motion to dismiss will be denied.

### F.     DCHRA

Plaintiff alleges that Chevy Chase violated his economic rights as a result of racial and ethnic discrimination in violation of the DCHRA. Defendant argues that plaintiff has not stated a claim, first because plaintiff does not provide a sufficient factual basis for a finding that defendant's actions were discriminatorily motivated, and second, because loans are not among the traditional areas on which the DCHRA focuses.

In the District of Columbia, the right to access economic and social resources free from improper discrimination is enshrined in the DCHRA, which guarantees that:

> Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations.

D.C. Code § 2-1402.01. A claim of discrimination under the DCHRA requires a plaintiff to show a nexus between his disparate treatment and his race and ethnicity. *Cf. Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 73 (D.D.C. 2002) ("The legal standard for discrimination under the DCHRA is substantively the same as under Title VII. . . . Thus, as under Title VII, in order to

state a *prima facie* case of gender discrimination under the DCHRA, plaintiff must establish: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; *and (3) that the unfavorable action gives rise to an inference of discrimination*." (emphasis added) (internal citations omitted)).

At the pleadings stage of litigation, a plaintiff is not required to set forth all of the *prima facie* elements of a discrimination claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Yet, the D.C. Circuit has emphasized that despite the fact that the complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,' . . . we accept neither 'inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint,' nor 'legal conclusions cast in the form of factual allegations.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)).

Plaintiff's discrimination claim under the DCHRA comes up short. Although the Amended Complaint states plaintiff's "belief" that racial and ethnic discrimination motivated defendant's actions toward him, it goes no further. (Am. Compl. ¶¶ 97-99.) Simply including the conclusory clause "by virtue of his race and ethnicity" (*Id.* ¶ 97) after recounting defendant's behavior, without any factual allegations that address the relevance of race and ethnicity, does not state a claim for discrimination. Plaintiff alleges his membership in a protected class by stating his race and ethnicity, but that alone does not meet the requirement of a "detailed factual allegation," under *Twombly*, to adequately allege that race or ethnicity motivated another's actions. [7]

---

[7] Plaintiff also reports that according to bank employees, defendant's treatment of him has been unique. (Am. Compl. ¶ 99 (alleging that employees conceded "that they had not seen any other situation where Defendant Chevy Chase customers had been subjected to the treatment to which Plaintiff has been subjected").) But uniqueness of treatment does not support a claim of discrimination. If anything, singularity of treatment undercuts the argument that treatment is

Finding only conclusory allegations of discrimination, the Court will dismiss Count VIII for failure to state a claim upon which relief can be granted. Therefore, the Court need not address defendant's argument that lending practices are not subject to the equal economic opportunities provision of DCHRA.

### G. Intentional Infliction of Emotional Distress

Plaintiff also claims that defendants' behavior constituted intentional infliction of emotional distress ("IIED"). Defendants argue that their acts were not sufficiently outrageous to give rise to IIED claims. The Court agrees.

"The tort of intentional infliction of emotional distress consists of (1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980); Restatement (Second) of Torts § 46 (1965)). The ultimate question is whether "the recitation of the facts to the average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quoting Restatement (Second) of Torts § 46 cmt. d). To meet this "demanding standard," the act or acts in question "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 173 (D.D.C. 2002) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)). Moreover, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . ." *Id.*

---

motivated by plaintiff's race and ethnicity, which, intuition dictates, are far from unique among defendant's customers.

Under the District of Columbia's definition of IIED, this Court has found, for example, that reasonable minds may differ, and thus that an IIED claim is adequately stated as to the outrageousness of behavior involving a claim of assault, battery, and unreasonable seizure by a police officer. *Qutb v. Ramsey*, 285 F. Supp. 2d 33, 51-52 (D.D.C. 2003). Other behavior has been found not to rise to the level of IIED, for example: an arrest based on careless error by a police detective, *Liser v. Smith*, 254 F. Supp. 2d 89, 106-07 (D.D.C. 2003); issuing a press release that incorrectly implicated the plaintiff in a murder he did not commit, *Minch v. D.C.*, 952 A.2d 929, 941 (D.C. 2008); baselessly convincing plaintiff that defendant had a lien on her property, *Wood v. Neuman*, 979 A.2d 64, 77 (D.C. 2009); and an employer's retaliatory constructive termination after the plaintiff reported her employer's fraudulent billing practices. *Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 139 (D.C. 2006).

Plaintiff argues that defendants' business practices belong in the category of behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious." *See Bernstein*, 649 A.2d at 1075. His Amended Complaint calls each of several discrete actions "unreasonable and outrageous," including "refus[ing] to accept mortgage payments" (Am. Compl. ¶ 106), "mak[ing] it increasingly more difficult for Plaintiff to make his mortgage payments" (*id.* ¶ 107), "discriminat[ing] against Plaintiff by virtue of his race and ethnicity" (*id.* ¶ 108), "fail[ing] to credit Plaintiff's mortgage payments in a timely manner" (*id.* ¶ 109), and "overcharg[ing] Plaintiff for PMI premiums." (*Id.* ¶ 110.) These allegations, taken as true, may describe poor business practices and a truly unpleasant experience for plaintiff, in addition to supporting plaintiff's other causes of action, but they do not rise to the level of being atrocious or outrageous. Therefore, the IIED claims will be dismissed.

### H. Defamation

Plaintiff claims that his character suffered defamation when Chevy Chase sent incorrect information to credit bureaus concerning his mortgage, mailed letters to his house falsely accusing him of defaulting on the mortgage, and changed his required methods of mortgage payment. He also claims that Stone and Capital One defamed his character by failing to correct the false information that Chevy Chase had communicated. Defendants respond by arguing that the alleged communications were not sufficiently defamatory to give rise to a cause of action – in other words, they did not make plaintiff look *bad enough* to have been truly defamatory. Stone and Capital One supplement that argument by indicating that they never affirmatively made defamatory statements, even under plaintiff's failure-to-correct theory, so they cannot be liable for defamation. (Stone MPA at 9.)

To make out a claim for defamation in the District of Columbia:

> a plaintiff must allege: "(i) a false and defamatory statement was written by the defendant about the plaintiff; (ii) the defendant published it without privilege to a third party; (iii) the defendant exhibited some fault in publishing the statement; and (iv) the statement is actionable as a matter of law or the publication has caused the plaintiff special harm."

*Ning Ye v. Holder*, 644 F. Supp. 2d 112, 117 (D.D.C. 2009) (quoting *Messina v. Fontana*, 260 F. Supp. 2d 173, 176-77 (D.D.C. 2003)). "In the District of Columbia, a statement is defamatory if it tends to injure the plaintiff in his or her trade, profession or community standing or lower him in the estimation of the community." *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (internal quotation marks omitted). The Court "will not dismiss a complaint under Rule 12(b)(6) which alleges defamation if 'the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning.'" *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A.2d 308, 313 (D.C. 2006) (quoting *Klayman v. Segal*, 783 A.2d 607, 612-13 (D.C. 2001)).

However, "an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C. 1970)). And in the Court's assessment of the statement's defamatory nature, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed." *Best*, 484 A.2d at 989.

Defendants focus on the "odious, infamous, or ridiculous" standard for defamation and argue that the statements at issue do not rise to that level. Yet, at this stage in the litigation the Court need not find that the statements *actually* portrayed plaintiff in an "odious, infamous, or ridiculous" light, but must merely find the statements "reasonably susceptible of a defamatory meaning," in order to find that plaintiff has stated a claim. *Clawson*, 906 A.2d at 313. The statements to credit bureaus[8] made plaintiff appear, at the very least, both irresponsible and

---

[8] Plaintiff also alleges that Chevy Chase defamed him "when it sent letters to Plaintiff's household alleging that he was in default on his mortgage when, in fact, at that time, he was not in default." (Am. Compl. ¶ 122.) The Court finds that this allegation fails to state a claim for defamation because it does not allege that defendant "published the statement without privilege *to a third party.*" *Ning Ye*, 644 F. Supp. 2d at 117 (emphasis added). The amended complaint does not state whether the letters allegedly sent by Chevy Chase to plaintiff's house were addressed to plaintiff or to other individuals residing there. And "[t]o constitute a publication it is necessary that the defamatory matter be communicated to some one other than the person defamed." Restatement (Second) of Torts § 577 cmt. b. As such, courts have held that "[t]here is no liability for publication when a sealed letter is sent to the plaintiff personally which is unexpectedly opened and read by another." *Farris v. Tvedten*, 623 S.W. 2d 205, 207 (Ark. 1981) (citing W. Prosser, The Law of Torts, s 113 n.41 (4th ed. 1971)); *see also Jones v. RCA Music Serv.*, 530 F. Supp. 767, 768 (E.D. Pa. 1982) (dismissing claim for libel where allegedly libelous collection letters were sent only to plaintiff); *Ray v. Henco Electronics, Inc.*, 274 S.E. 2d 602 603 (Ga. Ct. App. 1980) (defamatory language was not "published" by mailing the letter to plaintiff, even if plaintiff circulated letter to third parties, because defendants could not be held responsible for such publication). Although the Court must construe all "reasonable factual inferences in plaintiff's favor," *Maljack Prods., Inc.*, 52 F.3d at 375, the Court finds that it is not reasonable to infer that letters sent by Chevy Chase to plaintiff's household regarding plaintiff's mortgage contract with the bank were addressed to anyone other than plaintiff or that Chevy

financially insolvent.  Thus, the Court concludes that a reasonable person might consider one's character defamed by such a portrayal.

That conclusion is even stronger when the context is "understood by the readers to whom it was addressed."  *See* Best, 484 A.2d at 989.  Communications were sent to credit bureaus, so their ultimate audience comprised, *inter alia*, prospective creditors for whom the irresponsibility and financial insolvency conveyed by the bank's communications are of particular concern.  *See LaPrade v. Abramson*, No. 97-CV-10, 2006 WL 3469532, at *12-*13 (D.D.C. Nov. 29, 2006) (denying defendant's motion for summary judgment on defamation claim that alleged defendant "reported a false debt to credit bureaus").  Therefore, Chevy Chase's alleged statements to credit bureaus were reasonably susceptible of a defamatory meaning.

In contrast, the bank's periodic change of plaintiff's required payment methods cannot constitute defamatory statements.  Plaintiff argues that changing his payment requirements "implied" the same irresponsibility and financial insolvency as the other statements communicated.  (Am. Compl. ¶ 124.)  A pattern of changes in required payment methods simply is not susceptible to a defamatory meaning when considered as a whole, because such changes in the processes surrounding ministerial tasks are commonplace and typically result from any number of causes outside of a customer's control.  Any interpretation of a bank customer's change in payment methods as implying odiousness, infamy, or ridiculousness is not reasonable.  Accordingly, the Court concludes that plaintiff's Amended Complaint does not state a defamation claim upon which relief can be granted with regard to changes in his payment methods.

---

Chase had reason to know that the letters would be read by anyone other than plaintiff.  As such, it will dismiss plaintiff's defamation claim as to these communications.

Plaintiff's claim also falls short of adequately alleging defamation with regard to Stone and Capital One. Even taking as true plaintiff's allegation that "Stone and Capital One have continued the defamatory actions of Defendant Chevy Chase by continuing, among other things, to allow false information to remain on Plaintiff's credit bureau reports" (Am. Compl. ¶ 125), defendants correctly point out that the claim does not allege any affirmative communication. Without alleging the element of "a false and defamatory statement . . . written by the defendant," plaintiff has not stated a defamation claim. *Ning Ye*, 644 F. Supp. 2d at 117 (quoting *Messina*, 260 F. Supp. 2d at 176). Failure to correct another party's defamatory statement does not satisfy the element of a defamatory statement,[9] so plaintiff has not adequately claimed defamation on the part of Stone and Capital One.

Although plaintiff's allegations do constitute a claim upon which relief can be granted, that claim is limited to Chevy Chase's communications to credit bureaus. Plaintiff has not stated a defamation claim as to the other defendants or to the additional communications.

## CONCLUSION

For the reasons stated herein, the Court will grant defendants' motion to dismiss with respect to the following claims: breach of contract (Counts I and XI); tortious interference with contract (Counts II and III); fraud (Count VI); discrimination under the DCHRA (Count VIII);

---

[9] This conclusion accords with the findings of courts in other jurisdictions that a failure to correct is not an affirmative communication. *See, e.g.*, *Carter v. Dep't of Corrections-Santa Clara County*, No. C 09-2413, 2010 WL 2681905, at *9 (N.D. Cal. July 6, 2010) (finding that defamation outside of statute of limitations was not continued by defendant's ongoing failure to correct); *Hardey v. Newpark Res., Inc.*, No. 07-9025, 2008 WL 732715, at *1 (E.D. La. Mar. 18, 2008) (failure to correct gives rise to negligence, not defamation, claim under Louisiana law). *Cf. Buckines v. Mich. Parole Bd.*, No. 1:08-CV-17, 2008 WL 696438, at *6 (W.D. Mich. Mar. 12, 2008) (finding that officials' "failure to correct/expunge" false information from a prisoner's record "does not amount to active . . . behavior").

defamation of character as against Stone and Capital One, and plaintiff's claim for defamation of character arising from Chevy Chase's changes in his required methods of payment and the letters sent to plaintiff's household (Count XII in part); and intentional infliction of emotional distress (Counts IX and X). The Court will deny defendants' motion to dismiss with respect to plaintiff's claims for breach of the duty of good faith and faith dealing (Counts IV and V); the violation of the DCCPPA (Count VII); and plaintiff's claim for defamation of character arising from Chevy Chase's statements to credit bureaus (Count XII in part). A separate Order accompanies this Memorandum Opinion.

_____/s/_____<br>ELLEN SEGAL HUVELLE<br>United States District Judge

Date: August 9, 2010