**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                     )
CHRISTOPHER IHEBEREME, *et al.*,     )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )     Civil Action No. 10-1106 (ABJ)
                                     )
CAPITAL ONE, N.A.,                   )
as Successor by Merger to            )
Chevy Chase Bank, F.S.B., *et al.*,  )
                                     )
            Defendants.              )
_____ )


<u>**MEMORANDUM OPINION**</u>

Plaintiffs Christopher Ihebereme and Chidozie Ihebereme sue defendants Chevy Chase Bank and its successor in interest, Capital One, N.A., for actions related to Christopher Ihebereme's mortgage.  This matter is before the Court on defendants' motion for summary judgment and alternative motion for judgment on the pleadings.  For the reasons discussed below, the Court will grant defendants' motion.

**BACKGROUND**

**I.     The Mortgage and Plaintiffs' Payment History**

On March 28, 2007, plaintiff Christopher Ihebereme purchased a house in the District of Columbia and signed a thirty-year promissory note for $280,000.  *See* Note, Ex. A to Defs.' Mot.

1

for Summ. J and Altern. Mot. for J. on the Pldgs. [Dkt. # 34] ("Defs.' Mot.").[1]  His nephew plaintiff Chidozie Ihebereme co-signed the mortgage.  Note at 3.  The Note, which had an interest rate of 6.750%, required Christopher Ihebereme to pay $1,816.08 on the first day of every month until the mortgage was paid off.  *Id.* ¶ 3.  The Note also provided a grace period of fifteen days from the date a payment was due until the payment would be considered late.  *See id.* ¶ 6.  It required plaintiffs to make monthly payments to "P.O. Box 17000, Baltimore, MD 21203 or at a different place if required by the Note Holder."  *Id.* ¶ 3.  Finally, it required the co-signer, Chidozie Ihebereme, to satisfy the obligations under the Note if Christopher Ihebereme failed to do so.  *Id.* ¶ 8.  Plaintiffs do not dispute these obligations under the Note.  *See* Second Amended Complaint [Dkt. # 24] ("2d Am. Compl.) ¶¶ 13–19.

In connection with the mortgage, Christopher Ihebereme also signed a Deed of Trust, which required him to pay principal, interest, and funds into escrow every month.  *See* Deed of Trust, Ex. C to Defs.' Mot.  Escrow included $406.00 per month toward private mortgage insurance ("PMI").  Commitment/Certificate, Ex. D to Defs.' Mot.; Initial Escrow Account Discl. Stmt., Ex. E to Defs.' Mot.  According to an addendum to the loan application, which Christopher Ihebereme and Chidozie Ihebereme also signed, the PMI requirement would only be discontinued when the "loan balance amortizes or is paid down to 78% of the original value <u>and you are current on your monthly payments</u>."  Addendum to Loan Application, Ex. G to Defs.' Mot. ¶ 11 (emphasis in original).

---

1       The Note was originally with B.F. Saul Mortgage Company, but B.F. Saul Mortgage Company assigned the Note to defendant Chevy Chase Bank.  Decl. of A. Brunson-Matthews, Ex. K to Defs.' Mot. ("Brunson-Matthews Decl.") ¶¶ 4–5.  Chevy Chase Bank merged with defendant Capital One, N.A., which is the successor to Chevy Chase Bank.  *Id.* ¶ 6.

According to defendants, Christopher Ihebereme's monthly payments were paid within the fifteen day grace period and therefore timely from the beginning of the loan in May 2007 through February 2008.  Defs.' Mot. at 4, citing Loan History, Ex. F to Defs.' Mot. ("Defs.' Loan History").[2]  Plaintiffs dispute this, contending that Christopher Ihebereme was timely on his mortgage payments through November 2008.  Pls.' Opp. to Defs.' Mot. for Summ. J and Altern. Mot. for J. on the Pldgs. [Dkt. # 35] ("Pls.' Opp.") at 3.  Whether timely or late, it is undisputed that plaintiffs made monthly payments from May 2007 through March 2009 and that they were credited to the account on the following schedule.

---

2      From what the Court can discern, defendants' Loan History at Ex. F shows the loan's history only for 2009.  Plaintiffs attached a separate loan history, which appears to have been produced to them in discovery in this litigation by defendants.  That loan history shows monthly payments applied from the beginning of the loan in May 2007 through March 2009.  *See* Full Loan History, Ex. 29–50 to Pls.' Opp.

| Payment Due | Payment Made | Exhibit | Payment Credited to Account | Exhibit |
|---|---|---|---|---|
| May 1, 2007 | No evidence | None | May 8, 2007 | Pls.' Opp. Ex. at 50 |
| Jun. 1, 2007 | No evidence | None | Jun. 1, 2007 | Pls.' Opp. Ex. at 49 |
| Jul. 1, 2007 | No evidence | None | Jul. 2, 2007 | Pls.' Opp. Ex. at 58 |
| Aug. 1, 2007 | No evidence | None | Aug. 2, 2007 | Pls.' Opp. Ex. at 47 |
| Sep. 1, 2007 | No evidence | None | Sep. 7, 2007 | Pls.' Opp. Ex. at 47 |
| Oct. 1, 2007 | No evidence | None | Oct. 15, 2007 | Pls.' Opp. Ex. at 46 |
| Nov. 1, 2007 | No evidence | None | Nov. 13, 2007 | Pls.' Opp. Ex. at 45 |
| Dec. 1, 2007 | No evidence | None | Dec. 13, 2007 | Pls.' Opp. Ex. at 45 |
| Jan. 1, 2008 | No evidence | None | Jan. 14, 2008 | Pls.' Opp. Ex. at 44 |
| Feb. 1, 2008 | No evidence | None | Feb. 14, 2008 | Pls.' Opp. Ex. at 44 |
| Mar. 1, 2008 | No evidence | None | Mar. 18, 2008 | Pls.' Opp. Ex. at 43 |
| Apr. 1, 2008 | No evidence | None | Apr. 14, 2008 | Pls.' Opp. Ex. at 42 |
| May 1, 2008 | No evidence | None | May 16, 2008 | Pls.' Opp. Ex. at 41 |
| Jun. 1, 2008 | No evidence | None | Jun. 25, 2008 | Pls.' Opp. Ex. at 39 |
| Jul. 1, 2008 | No evidence | None | Jul. 28, 2008 | Pls.' Opp. Ex. at 38 |
| Aug. 1, 2008 | No evidence | None | Aug. 28, 2008 | Pls.' Opp. Ex. at 37 |
| Sep. 1, 2008 | No evidence | None | Sep. 26, 2008 | Pls.' Opp. Ex. at 36 |
| Oct. 1, 2008 | No evidence | None | Oct. 28, 2008 | Pls.' Opp. Ex. at 35 |
| Nov. 1, 2008 | No evidence | None | Dec. 1, 2008 | Pls.' Opp. Ex. at 34 |
| Dec. 1, 2008 | No evidence | None | Dec. 31, 2008 | Pls.' Opp. Ex. at 33 |
| Jan. 1, 2009 | No evidence | None | Jan. 26, 2009 | Pls.' Opp. Ex. at 32 |
| Feb. 1, 2009 | Feb. 25, 2009 | Pls.' Opp. Ex. at 54 | Mar. 19, 2009 | Pls.' Opp. Ex. at 31 |
| Mar. 1, 2009 | Apr. 28, 2009 | Pls.' Opp. Ex. at 55 | Apr. 30, 2009 | Defs.' Mot. Ex. F at 2 |

The last payment plaintiffs made on the mortgage was on April 28, 2009 for the March 2009 payment. *See* Defs.' Loan History; March 2009 Payment Receipt, Ex. 55 to Pls.' Opp.[3]

## II.      Facts Giving Rise to Plaintiffs' Claims

Plaintiffs' nine count complaint revolves around four core issues that plaintiffs characterize as:  defendants' refusal to permit Christopher Ihebereme to make his monthly mortgage payments online, their alleged failure to properly credit three payments in a timely

---

3       Plaintiffs marked their exhibits sequentially by page number, which appear at the top center of each page, while defendants marked each of their separate exhibits by letter.  The Court's citations to the exhibits follow the parties' formats.

manner, their alleged improper calculation and maintenance of the PMI requirement on the mortgage, and allegedly false statements they made about the loan to credit bureaus and to Christopher Ihebereme's family and failed to correct.  *See generally* 2d Am. Compl.

### A.    How Plaintiff Christopher Ihebereme Paid His Mortgage

Christopher Ihebereme made his first several monthly payments for the mortgage online. Pls.' Opp. at 4.  Because he was paid on the 15th of every month and because he had a fifteen day grace period from the first of each month when his mortgage was due, he would transfer his monthly payment online just after he was paid, and the payment would still be timely.  *Id.*, citing Christopher Ihebereme Dep., Ex. 20–25 to Pls.' Opp.  Plaintiffs claim that the mortgage payments began to be paid late only after Chevy Chase stopped "allowing" Christopher to make payments online.  2d Am. Compl. ¶ 26; Pls. Opp. at 4.

While plaintiffs complain that there came a time when Christopher Ihebereme was consistently unable to successfully accomplish online payments, the record contains no evidence explaining why he was no longer able to do so.  *See* Pls.' Opp. at 4 n.4 (stating that defendants "repeatedly failed and refused to provide information about their computer systems, or troubleshooting or other activities undertaken to address Plaintiff Christopher's[] issues").  Nor is there any evidence that this permission to do so was in fact revoked.  It is undisputed that the Note required plaintiffs to make monthly payments to "P.O. Box 17000, Baltimore, MD 21203 or at a different place if required by the Note Holder."  Note ¶ 3.  It is also undisputed that plaintiffs had alternative ways to pay their mortgage, aside from paying online.  *See* Christopher Ihebereme Dep., Ex. U to Defs.' Mot. at 146:13–147:5 (testifying that plaintiffs could have made their monthly payments by mail or phone or at the branch); *id.* at 153:4–:6, 155:9–:13 155:17–

:21 (testifying that Christopher Ihebereme made the April 2008, May 2008, and June 2008 payments at a bank branch).[4]

### B.    Crediting of Mortgage Payments

Plaintiffs complain that defendants failed to credit Christopher Ihebereme's payments for December 2008, January 2009, and February 2009 in a timely manner.  2d Am. Compl. ¶ 22. There is no evidence showing when plaintiffs made the December 2008 and January 2009 payments, but the evidence does show that the December payment was applied to the account on December 31, 2008, and the January payment was applied on January 26, 2009.  Full Loan History, Ex. 32–33 to Pls.' Opp.  The evidence also shows that the February 2009 payment was credited to the account on March 19, 2009 despite being paid on February 25, 2009.  *Id.*; February 2009 Payment Receipt, Ex. J to Defs.' Mot.  Defendants acknowledge this delay was an error on their part and state that they corrected it.  Brunson-Matthews Decl. ¶ 23; Letter from Robin Key, Credit Analyst, Chevy Chase Bank to Christopher Ihebereme (March 30, 2009), Ex. 11 to Pls.' Opp. and Ex. N to Defs.' Mot. ("Correcting Letter") (stating "the late payment reporting for the payment due February 1, 2009 will be removed from your credit report").

### C.    Reports to Credit Agencies and Letters to Christopher Ihebereme

Plaintiffs complain that defendants made incorrect reports to credit reporting agencies about the status of the mortgage.  2d Am. Compl. ¶ 30.  Defendants do not dispute that Chevy Chase mistakenly delayed crediting the February 2009 payment, which resulted in an incorrect report of the loan's status to credit reporting agencies.  Defs.' Mot. at 19; Brunson-Matthews

---

4      Defendants filed a Corrected Memorandum of Points and Authorities in Support of their motion on March 22, 2013 [Dkt. 39], attaching Ex. U which was missing from the original memorandum.

Decl. ¶ 23.  But the bank corrected the February error internally and with the credit reporting agencies.  Defs.' Mot. at 19; *see also* Correcting Letter; Credit Report, Ex. O to Defs.' Mot. (showing only the March 2009, and not the February 2009, payment as late after Chevy Chase's correction).  Further, defendants show that the reports to the credit agencies about plaintiffs' other late payments are accurate.  Defs.' Loan History at 2 (showing March 2009 payment was applied on April 30, 2009); March 2009 Payment Receipt (showing March 2009 payment was made on April 28, 2009).  A credit report for Christopher Ihebereme dated March 31, 2009 shows a 30–59 day delinquency for the "3/09" payment of $2469.  Credit Report at 1.

Plaintiffs also complain about letters that defendant allegedly sent to Christopher Ihebereme's household, which were addressed to "Occupant" and stated that the mortgage was in default when it was not.  2d Am. Compl. ¶ 93.  They assert that because of these letters, Christopher Ihebereme became estranged from his family.  *Id.* ¶¶ 94–96.  Plaintiffs provide the Court with no letters addressed to "Occupant," however.  The letters they do provide are specifically addressed to the mortgagees, Christopher Ihebereme and Chidozie Ihebereme.  *See* Mortgage Letters, Ex. 5–8 to Pls.' Opp.; Letter from Karen Neugebauer to Christopher Ihebereme (April 10, 2009), Ex. H to Defs.' Mot. at 1 and Ex. 9 to Pls.' Opp. ("PMI Denial Letter"); Correcting Letter; Letter from David Prensky, Chasen & Chasen (April 13, 2010), Ex. 15 to Pls.' Opp.

### D.    Issues with PMI Requirement

In March 2009, Christopher Ihebereme asked Chevy Chase Bank to remove the requirement for PMI on his loan.  Pls.' Opp. at 4.  According to an addendum to the loan application, the PMI requirement would only be discontinued when the loan balance amortized or was paid down to 78% of the original value and if the loan's monthly payments were current.

Addendum to Loan Application ¶ 11.  As of March 2009, only $5,629.08 or approximately 2% had been paid on the loan.  *See* Defs.' Loan History; Full Loan History, Ex. 29 to Pls.' Opp. (showing principal balance on April 16, 2009 of $274,370.92 on a loan of $280,000).

Plaintiffs do not dispute the written terms of the Addendum.  Instead, Christopher Ihebereme testified in deposition that he understood the terms for removal of the PMI requirement were different.  *See* Christopher Ihebereme Dep., Ex. 2–4 to Pls.' Opp. ("I was supposed to deposit 20,000.  If I deposited 20,000, there would be no PMI. . . .That's what Mr. Allison told me at the inception of the loan, . . . he also said that, if after two years I didn't miss any monthly payments, I was not late for up to 30 days, that the mortgage insurance will be dropped.")

On April 10, 2009, Chevy Chase denied Christopher Ihebereme's request to remove the PMI requirement on the grounds that a borrower "must have had no payment 30 days or more past due in the 12 months preceding the date on which the mortgage insurance will be cancelled and must have had no payment 60 days or more past due in the 24 months preceding that date." PMI Denial Letter at 1.  Plaintiffs contend that the only reason they had a payment more than 30 days late was because the February 2009 payment was credited late, disqualifying the loan from removal of the PMI requirements. Pls.' Opp. at 4.  The evidence shows, though, that as of Chevy Chase's denial on April 10, 2009, plaintiffs had not made the payment due on March 1, 2009. Full Loan History, Ex. 29–30 to Pls.' Opp.; March 2009 Payment Receipt.

III.    **Procedural History**

Plaintiff Christopher Ihebereme originally filed suit in D.C. Superior Court and filed an amended complaint, which defendants moved to dismiss.  *See* Original File from D.C. Superior Court [Dkt. # 3].  After the case was removed to this court, the court granted defendants' motion

to dismiss in part and denied it in part.  *See* Order on Defs.' Mot. to Dismiss [Dkt. # 6].  On May 4, 2011, Christopher Ihebereme filed an amended complaint [Dkt. # 17], which was amended a second time on June 24, 2011, adding Chidozie Ihebereme as a plaintiff.  *See* 2d Am. Compl.

In the second amended complaint, plaintiffs sue for breach of contract, breach of duty of good faith and fair dealing, fraud, violations of the D.C. Consumer Protection Procedures Act ("DCCPPA"), defamation, breach of promissory estoppel, violations of the Homeowner's Protection Act, and violations of the Fair Credit Reporting Act ("FCRA").  The parties engaged in discovery, which closed on January 20, 2012.  *See* Minute Entry (Jan. 17, 2012).

Defendants filed a motion for summary judgment and in the alternative a motion for judgment on the pleadings, which has been fully briefed and is now pending before the Court. *See* Defs.' Mot.; Pls.' Opp.; Defs.' Reply in Supp. of Defs.' Mot. for Summ J. and Altern. Mot. for J. on the Pldgs. [Dkt. # 37].

### STANDARD OF REVIEW

### I.      Judgment on the Pleadings

A motion for judgment on the pleadings pursuant to Rule 12(c) may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Longwood Vill. Rest., Ltd. v. Ashcroft*, 157 F. Supp. 2d 61, 66 (D.D.C. 2001), citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  Put another way, "[i]f there are allegations in the complaint which, if proved, would provide a basis for recovery[,] the Court cannot grant judgment on the pleadings."  *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (second alteration in original) (internal quotation marks omitted).

"The standard of review for such a motion is essentially the same as the standard for a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)."  *Longwood*,

157 F. Supp. 2d at 66–67.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*:  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  556 U.S. at 678.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  A pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id*.  In evaluating a motion for judgment on the pleadings under Rule 12(c), the court may consider facts alleged in the complaint as well as documents attached to or incorporated by reference in the complaint.  *Qi v. FDIC*, 755 F. Supp. 2d 195, 199–200 (D.D.C. 2010).

## II.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).   The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.   The non-movant may not, however, rest upon the mere allegations or denials of its pleadings, but must instead establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252.   The court will "not accept bare conclusory allegations as fact." *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997); *see also Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record.").

A motion for judgment on the pleadings must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court." Fed. R. Civ. P. 12(d); *see also Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003) (per curiam) (holding that the district court's consideration of matters outside the pleadings converted

the defendant's Rule 12 motion into one for summary judgment).  In *Bonnette*, we said that, "Because both parties have submitted matters outside of the pleadings, and the Court will consider them in the resolution of at least some issues presented by this motion, the Court will treat it as one for summary judgment." *Bonnette v. Shinseki,* Civil Action No. 10-2110 (ABJ), 2012 WL 5986466, *9 (D.D.C. Nov. 30, 2012).

## ANALYSIS

Plaintiffs' second amended complaint presents nine separate counts.  Defendants assert that to the extent plaintiffs' claims relate to reports defendants made to credit bureaus, those claims are preempted by the Fair Credit Reporting Act.  Defs.' Mot. at 9–11.  The Court addresses the FCRA preemption arguments first, then addresses the parties' other arguments.

### I.    Claims Preempted by the Fair Credit Reporting Act

#### A.    Plaintiffs' state law claims relating to defendants' reports to credit agencies are preempted under FCRA Section 1681t(b)(1)(F).

Section 1681t(b)(1)(F) of FCRA provides that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies."  15 U.S.C. § 1681t(b)(1)(F).  Section 1681s-2, in turn, governs the duty to provide accurate credit information and the duty to investigate, report, and correct inaccurate information upon notice of a dispute.  *Id.* § 1681s-2(a) and (b).  Accordingly, claims made under state law concerning the furnishing and correcting of information to credit reporting agencies are preempted by FCRA.  *Dubois v. Wash. Mut. Bank*, Civ. A. No. 09-2176 (RJL), 2010 WL 3463368, at *4 (D.D.C. Sept. 3, 2010) (holding that the plaintiff's claim arising "directly out of defendants' alleged furnishing of credit information to credit reporting agencies" was preempted).

Four of plaintiffs' counts present state law claims concerning defendants' alleged false or incorrect reports to credit reporting agencies and their alleged failure to rectify incorrect reports to credit agencies:  Count II, breach of duty of good faith and fair dealing, 2d Am. Compl. ¶¶ 30–32, 43d–43e; Count V, violations of the DCCPPA, *see id.* ¶ 78; Count VI, defamation, *see id.* ¶¶ 89–92; and Count VII, promissory estoppel, *see id.* ¶ 98.  To the extent those claims arise from the contention that defendants provided false information to credit agencies or failed to correct false information they provided to credit agencies, those claims are preempted, and the Court will dismiss those claims with prejudice.[5]

### B.     Plaintiffs' defamation claim relating to defendants' reports to credit agencies is also preempted under FCRA section 1681h(e).

FCRA also expressly precludes plaintiffs from bringing defamation actions arising from false credit reporting, except those involving the provision of "false information furnished with malice or willful intent to injure such consumer."  15 U.S.C. § 1681h(e); *see also Adams v. Martinsville Dupont Credit Union*, 573 F. Supp. 2d 103, 118 (D.D.C. 2008) (ruling that state-law based defamation claim alleging false reporting to the credit reporting agencies with malice and/or willful intent to injure to be preempted).  To maintain their defamation action, plaintiffs must show that the defendants "acted maliciously or with a willful intent to injure the plaintiff." *Haynes v. Navy Fed. Credit Union*, 825 F. Supp. 2d 285, 297 (D.D.C. 2011).  "[A] statement is deemed to have been made with malice when the speaker either knew it was false or acted in

_____

[5]     Defendants assert that portions of plaintiffs' fraud claim, Count IV, are also preempted by FCRA.  *See* Def. Mot. at 10.  But the portion of the fraud claim they contend is preempted concerns the bank's failure to credit three of Christopher Ihebereme's payments in a timely manner, putting him in a delinquent status.  It does not concern the bank's reporting that delinquent status to credit agencies, so it is not preempted by FCRA.

reckless disregard of its truth or falsity.  Reckless disregard, in turn, requires evidence that the speaker entertained actual doubt about the truth of the statement."  *Wiggins v. Equifax Servs., Inc.*, 848 F. Supp. 213, 223 (D.D.C. 1993) (citation omitted) (finding a dispute of material fact because the undisputed evidence showed that at least one of the defendant's employees knew the information was false and the parties disputed whether this knowledge was communicated to the defendant before it issued its report).

Defendants argue that plaintiffs failed to allege the requisite malicious intent.  Defs.' Mot. at 11.  Plaintiffs counter that while they never used the word "malice," "the concept of malice and deliberate adverse actions against Plaintiffs" could be found throughout their pleadings, demonstrating "a pattern and practice of behavior designed to ensure that Plaintiff failed to meet his mortgage obligations."  Pls.' Opp. at 26–27.

Plaintiffs' defamation claim relates to reports defendants allegedly made about the December 2008, January 2009, and February 2009 payments.  2d Am. Compl. ¶¶ 22, 89–92. With respect to the February 2009 payment, it is undisputed that Christopher Ihebereme made that payment on February 25, 2009, but Capital One failed to contemporaneously credit his account due to "an internal error."  Brunson-Matthews Decl. ¶ 23.  When Christopher Ihebereme notified the bank of the error, Capital One sent him a letter informing him it would correct the error.  Correcting Letter at 1.  Capital One then did correct the payment-posting error and accurately reported the status of Plaintiffs' account the following day.  Defs.' Mot. at 5, citing to Credit Report at 1 (credit report of Christorpher Ihebereme dated March 31, 2009 showing only March 2009 payment as late).

Plaintiffs do not allege malice with respect to the credit reports.  They do not allege that defendants misreported any of the three mortgage payments as delinquent when they knew that

the payments had, in fact, been made.  *See* 2d Am. Compl. ¶¶ 30–31, 43d–e, 78, 89–90, 98, 113.

Nor do plaintiffs allege that defendants acted in reckless disregard of the truth by "entertain[ing]

actual doubt" about whether Christopher Ihebereme had made the payments on time.  *Id*.

Plaintiffs do not challenge defendants' assertion that the misreporting was due to an oversight.

*See* 2d Am. Compl. ¶ 28 (alleging that Chevy Chase "negligently" failed to credit certain

payments in a timely manner).  And they do not challenge that defendants corrected that

crediting error.  *See* Correcting Letter.  Accordingly, under *Wiggins*, the reports sent to credit

reporting agencies about the February 2009 payment cannot be deemed to have been made with

malice.

As for plaintiffs' claim that the bank also reported false information about the December

2008 and January 2009 payments, the only late payment identified in the credit reports is a

March 31, 2012 credit report for Christopher Ihebereme showing that his March 2009 payment

was more than 30 days late.  Credit Report at 1.  Plaintiffs present no evidence of *any* statements

to credit agencies about the December 2008 and January 2009 payments.  And although

plaintiffs assert that "there was no 30 day delinquency on March 31, 2009," Pls.' Opp. at 26, the

evidence shows that as of March 31, 2009, when the credit report issued, the payment due on

March 1, 2009 was unpaid.  *See* Credit Report; Full Loan History, Ex. 30 to Pls.' Opp.  Indeed,

plaintiffs own exhibits confirm that the March payment was not made until April 28, 2009.

March 2009 Payment Receipt, Ex. 55 to Pls.' Opp.; *accord* Defs.' Loan History.

Given that plaintiffs do not allege malice in regard to the February 2009 report, that the

evidence shows no reports at all to credit agencies about the December 2008 and January 2009

payments, and that the report to credit agencies about the late March 2009 payment is accurate

and undisputed, the Court finds no evidence that false information was furnished with malice or

willful intent.   So, Plaintiffs' defamation claim as to credit reporting is also preempted by Section § 1681h(e) of FCRA, and it will be dismissed.

## II.      Defamation as to Christopher Ihebereme's Family

Plaintiffs also claim defamation as a result of letters that Chevy Chase allegedly sent "addressed to 'Occupant' to Plaintiff Christopher's household."   2d Am. Compl. ¶ 93.   This portion of plaintiffs' claim does not relate to reporting information to credit agencies, so it not preempted by FCRA.   Nonetheless, defendants are entitled to summary judgment based on the undisputed facts.

In the District of Columbia, a plaintiff can state a claim for defamation by alleging four elements:

> (i) a false and defamatory statement was written by the defendant about the plaintiff; (ii) the defendant published it without privilege to a third party; (iii) the defendant exhibited some fault in publishing the statement; and (iv) the statement is actionable as a matter of law or the publication has caused the plaintiff special harm.

*Messina v. Fontana*, 260 F. Supp. 2d 173, 176–77 (D.D.C. 2003), *aff'd sub nom. Messina v. Krakower*, 439 F.3d 755 (D.C. Cir. 2006).   A qualified privilege exists if the publisher believes, with reasonable grounds, that his statement is true.   *Ford Motor Credit Co. v. Holland*, 367 A.2d 1311, 1314 (D.C. 1977).

The evidence shows that Chevy Chase sent letters specifically addressed to Christopher Ihebereme and Chidozie Ihebereme. *See* Mortgage Letters, Ex. 5–8 to Pls.' Opp.   The record shows no letters to "Occupant" as plaintiffs allege.   So the evidence does not show that defendants published anything to a third party.   Further, the evidence shows that although the bank credited the February 2009 payment late, it did so erroneously.   Brunson-Matthews Decl.

16

¶ 23.   The evidence also shows that plaintiffs' March 2009 payment was paid late, on April 28, 2009.   March 2009 Payment Receipt, Ex. 55 to Pls.' Opp.; *accord* Defs.' Loan History at 2. Thus, when Chevy Chase sent letters to plaintiffs stating that the loan was delinquent, the bank reasonably believed the truth of those statements:  it mistakenly believed the payment made on February 25 was not paid until March 19, and the March 2009 payment was, in fact, late.   The bank, therefore, had a qualified privilege for the letters it sent to plaintiffs.   Defendants are entitled to summary judgment on the claim of defamation arising out of these letters.

## III.   Breach of Contract

Plaintiffs claim that because Chevy Chase failed to credit three of their payments in a timely manner, it was obligated under the Deed of Trust to pay interest on the amounts applied late.   2d Am. Compl. ¶ 22.   Because Chevy Chase did not do so, they argue, it breached their contract.   *Id.* ¶ 24.   Defendants claim that there is no breach of the Deed of Trust under its express terms.   Defs.' Mot. at 12–14.

To prevail on a breach of contract claim, plaintiffs must show "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009); *see San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (finding that a plaintiff "must allege and establish" all four elements to recover).

Plaintiffs' breach claim centers on language in the Deed of Trust governing payments:

> 1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3. . . .
> Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be

designated by Lender . . . .  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  *If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.*  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.

Deed of Trust at 4 ¶ 1 (emphasis added).  According to plaintiffs, Chevy Chase failed to credit the December 2008, January 2009, and February 2009 payments in a timely manner and, under the Deed of Trust, was required to pay interest on the unapplied funds.  2d Am. Compl. ¶ 22.  But plaintiffs' reading of the single sentence it relies on for its claim takes the sentence out of context.

The Deed of Trust sets forth the requirements for when, how, and where payments are to be made.  Deed of Trust at 4 ¶ 1.  It then sets forth what happens when a payment is made that is insufficient to bring the loan current:  the lender may return the payment or it may accept the payment without waiving its rights under the deed or prejudicing its right to refuse a such payment in the future.  *Id.*  The Deed of Trust then states the lender is "not obligated to apply such payments [that do not bring a loan current] at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds."  *Id.*  But if a borrower makes payments that do not bring a loan current, a lender may choose to "hold such unapplied funds" and give the borrower time to bring the loan current.  *Id.*  If the borrower does not do so in a reasonable time, the lender must either apply the

18

funds or return them to the borrower.  *Id.*  And if the lender in that situation applies the funds, the funds must be "applied to the outstanding principal balance under the Note immediately prior to foreclosure."  *Id.*  So, if a borrower falls behind on his payments so that his loan is not current, and makes payments, but those payments do not make the loan current, the bank can choose to hold the payments – but not apply the payments – to the loan, and wait to see if the borrower will eventually catch up on his payments.  If he does not, the bank must either return the payments it was holding or, immediately before foreclosure, apply the payments to the principal owed.  And if the bank chooses to return the payments, it must do so with interest.  But "[i]f each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds."  *Id.*

There is no express requirement in the Deed of Trust that obligates the lender to pay interest on a late payment that it fails to credit immediately when it is finally received.[6] Plaintiffs read the requirement, "[i]f each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds" to mean the bank must pay interest on funds that are applied late.  But defendants were not holding "unapplied" funds that were insufficient to bring the loan current and waiting to see if the borrower would bring the loan current.  The full monthly payments owed for December 2008, January 2009, and February 2009 were applied to the loan.  Full Loan History, Ex. 31–33 to Pls.' Opp.  The Deed of Trust states the lender "need not pay interest on *unapplied* funds" if each monthly payment is applied on its

---

6       Once again the Court notes that since there is no evidence showing when plaintiffs made the December and January payment, there is no support for the claim that they were not applied to the account in a timely fashion.  And although there was a mistake as to when the February payment was credited, it is undisputed that it was late when it came in.

scheduled due date.  Deed of Trust at 4 ¶ 1 (emphasis added).  The Deed of Trust then addresses the bank's options for handling "unapplied" funds held when the loan is not brought current, and requires "unapplied" funds to be returned to the borrower or applied to the principal due before foreclosure.  Deed of Trust at 4 ¶ 1.  Its use of the term "unapplied" funds indicates that interest is paid on funds that are held when a payment does not make a loan current.  Because it is undisputed that the bank *applied* the three full monthly payments to plaintiffs' loan, the bank did not owe plaintiffs interest.  Accordingly, it did not breach the Deed of Trust and defendants' motion for summary judgment on this count will be granted.

## IV.    Breach of Duty of Good Faith and Fair Dealing

Plaintiffs allege that Chevy Chase "arbitrarily refused to allow Plaintiff Christopher to make his mortgage payments using the on-line mechanism" or "using bank tellers and/or bank managers," "negligently failed to credit certain payments" that were paid timely, "failed to pay interest to Plaintiffs Christopher and Chidozie on payments not credited timely," and "made false and inaccurate reports to the credit bureaus" affecting each plaintiff and failed to correct them. 2d Am. Compl. ¶¶ 26–32.

D.C. law implies a duty of good faith and fair dealing in all contracts, "which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000), quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988).  "This duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance."  *Hais*, 547 A.2d at 987–88.  In other words, defendant "could not have breached its duty of fair dealing when reasonable persons in the parties' shoes

would have expected the contract to be performed as it was." *Adler v. Abramson*, 728 A.2d 86, 90–91 (D.C. 1999).

Because plaintiffs' breach of contract claim that defendants failed to pay them interest on late-applied payments fails, *see supra* Analysis Section III, their claim for breach of the duty of good faith and fair dealing on that issue also fails. Plaintiffs were not entitled to interest payments under the contract, so defendants could not have done anything to destroy or injure the plaintiffs' right to receive them. *See Paul v. Howard Univ.*, 754 A.2d at 310. Further, because their claim concerning defendants' reports to credit bureaus is preempted by FCRA, that portion of the claim also fails. *See supra* Analysis Section IA. This leaves the claims that defendants did not allow Plaintiff Christopher to pay his mortgage online or at the branch, and that they failed to credit certain payments in a timely manner.

### A.       Claim regarding Paying Mortgage Online

Plaintiffs allege that Chevy Chase breached the duty of good faith and fair dealing when it "arbitrarily refused" to allow Christopher Ihebereme to make his mortgage payments online or at the branch. 2d Am. Compl. ¶¶ 26–27. The parties' contract required plaintiffs to make monthly payments at "P.O. Box 17000, Baltimore, MD 21203 or at a different place if required by the Note Holder." Note ¶ 3. The record does not show that defendants *required* plaintiffs to make payment "at a different place" than the post office box address listed in the Note. However, it is undisputed that Christopher Ihebereme was able to make his payments online for some period of time. *See* Pls.' Opp. at 4; Defs.' Mot. at 30.

Defendants contend, however, that the claim must fail because the Note did not obligate them to accept payment other than at the post office box listed on the Note. Defs.' Mot. at 16. They cite *Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 172 (D.D.C. 2001) for the

proposition that they did not breach a duty of good of faith and fair dealing because the terms of the Note "flatly contradicted" the contention that plaintiffs should have been able to pay online. Defs.' Mot. at 16.  But *Davis* held that the plaintiffs in that case could not make claims for breach of contract, fraud, or negligence because the terms of the contract contradicted the bases for those claims.  806 F. Supp. 2d at 172–73.  Here the contract did not specify online payment, but it did not prohibit it either.

The implied duty of good faith and fair dealing requires neither party to do anything that would destroy or injure the right of the other party to receive the fruits of the contract, including interfering with the other party's performance.  *Paul*, 754 A.2d at 310; *Hais*, 547 A.2d at 987. The crux of plaintiffs' claim about paying online is that defendants interfered with their ability to perform under the contract.  The fact that Christopher Iheberere was able to pay online for some months without objection from the bank suggests that defendants were willing to accept payment through means other than at the post office box listed on the Note.  So even though the Note identified the post office box as the location of payment does not in and of itself mean that plaintiffs cannot prevail on a claim for breach of the duty of good faith and fair dealing, when the evidence shows the bank would accept payments in a different manner from that listed on the Note.  The relevant question is whether the record shows defendants interfered with plaintiffs' performance.

Here plaintiffs' claims fail.  There is no evidence other than the conclusions expressed in Christopher Iheberere's deposition testimony that the difficulties he experienced online were the result of any action by Chevy Chase.  *See, e.g.,* Christopher Iheberere Dep., Ex. 52 to Pls.' Opp. at 71:19–:21 ("[W]hen the one year was over, I was denied access to online payments."). Moreover, it is undisputed that plaintiffs could have paid the mortgage over the phone, by mail,

at a bank branch, or at the headquarters of the bank.   Christopher Ihebereme's Dep., Ex. U to Defs.' Mot. at 146:13–147:6.   Further, the evidence shows that plaintiffs did, in fact, pay at a branch on a number of occasions.   *Id.* at 153:4–:6, 155:9–:13, and 155:17–:21.   It also shows that Christopher Ihebereme chose not to pay by mail based on his belief that a past letter he had mailed to the bank "never went through."   *Id.* at 144:4–145:19.   So there is no evidence in the record that would create a genuine issue of fact on the question of whether defendants intentionally prevented plaintiffs from performing their contractual obligation to pay the mortgage.

### B.     Claim regarding Failure to Credit Payments Timely

Plaintiffs' claim that defendant "negligently failed to credit certain payments" that were paid timely refers to their allegations that Chevy Chase did not credit the December 2008, January 2009, and February 2009 payments in a timely manner.   2d Am. Compl. ¶¶ 22, 28.   They submit that these actions breached the duty of good faith and fair dealing.   Defendants assert that the reasoning that supports of their position on the breach of contract claim applies to this claim as well, Defs.' Mot. at 19, contending that in the absence of a clear contractual duty *to* do something, a party cannot breach the implied duty of good faith by failing to do it.

Again, the relevant question in a claim concerning the duty of good faith and fair dealing is not whether the contract expressly prescribes or forbids the complained-of actions but whether a party's actions destroy or injure the rights of the other party to receive the fruits of the contract. *Hais*, 547 A.2d at 987.   Defendants point to the language in the Deed of Trust about when the lender must pay interest on unapplied funds to support their argument that they are not obligated to credit payments in a timely matter.   *See* Defs.' Mot. at 19.   But that provision says nothing

23

about how a bank is supposed to apply payments that are *sufficient* to bring the loan current.  *See* Deed of Trust at 4 ¶ 1.[7]

It would be unreasonable to interpret the Deed of Trust to allow the bank to hold the borrower's full monthly payment indefinitely just because the Deed of Trust is silent on when the bank must apply the payment.  It would contradict the spirit of the contract for a borrower to make a full monthly payment on the loan the first of the month and the bank to refrain from crediting that payment to the account indefinitely.  *See Adler*, 728 A.2d at 90–91 (applying a reasonableness standard and asking whether "reasonable persons in the parties' shoes would have expected the contract to be performed as it was").  Thus, the Court disagrees with defendants that the Deed of Trust's express terms alone cause plaintiffs' claim to fail.  The question is whether plaintiffs have come forward with evidence to create a genuine dispute of material fact on the issue of whether defendants failed to credit payments in a reasonable manner under the contract.

Defendants point out that none of the three payments that give rise to this claim was timely, or even made within the fifteen-day grace period.  Defs.' Mot. at 13–14, citing Defs.' Loan History; *see also* February 2009 Payment Receipt.  Plaintiffs provide evidence showing when the February 2009 payment was made and that it was applied nearly a month later.  *See* February 2009 Payment Receipt; Full Loan History, Ex. 31 to Pls. Mot.  Defendants acknowledge that they mistakenly credited the February 2009 payment on March 19, 2009

---

[7]     Paragraph two of the Deed of Trust addresses the application of payments or proceeds but only in providing the order in which payments will be applied (first to interest, then to principal, then to escrow).  Deed of Trust at 4 ¶ 2.  It does not provide *when* payments sufficient to bring a loan current must be applied.  *Id.*  Defendants do not argue that this paragraph entitles them to hold payments indefinitely.

instead of on February 25, 2009.  Brunson-Matthews Decl. ¶ 23.    Plaintiffs offer no evidence, other than unsubstantiated claims, however, showing that the bank delayed crediting the December 2008 payment.  *See* Christopher Ihebereme Dep., Ex. M, 34:8–:12, 35:7–:8 (Q:  "So if the bank's payment history shows that you made the payment on December 31, 2008, would you have any reason to disagree with that? A:  I might not have any reason to disagree with it. . . . I don't really know, but I paid it within the month of December.")   Further, they present no evidence that shows when the January 2009 payment was made.  Thus, there is not sufficient evidence from which a reasonable fact-finder could find for plaintiffs that defendants breached their duty to deal fairly with plaintiffs, and the motion for summary judgment on this count will be granted.

**V.     Breach of Duty of Good Faith and Fair Dealing with Respect to PMI**

Plaintiffs allege that defendants also breached the implied duty of good faith and fair dealing by refusing to credit three of his payments in a timely manner, making it difficult for Christopher Ihebereme to make monthly payments so he would not be eligible to have the PMI requirement removed, and miscalculating the amount of PMI owed, overcharging plaintiffs for PMI.  2d Am. Compl. ¶¶ 52, 54–61.  Defendants assert that the evidence shows the mortgage was not eligible for PMI abatement and that they did not overcharge plaintiffs.  Defs.' Mot. at 22–24.

Plaintiffs had to satisfy certain requirements before PMI would be removed from their mortgage.  The loan documents provide that PMI could be discontinued "when your loan balance amortizes or is paid down to 78% of the original value <u>and</u> you are current on your monthly payments."  Addendum to Loan Application ¶ 11 (emphasis in original).  Also, a borrower "must have had no payment 30 days or more past due in the 12 months preceding the date on which the

mortgage insurance will be cancelled and must have had no payment 60 days or more past due in the 24 months preceding that date." PMI Denial Letter at 1; 2d Am. Compl. ¶ 47.

Any claimed duty of good faith and fair dealing must comport with the terms of the parties' contract. *See Paul*, 754 A.2d at 310–11 (university not liable for breach of implied covenant of good faith and fair dealing by denying the plaintiff's tenure applications because the plaintiff had no contractual right to receive tenure). As of March 2009, when plaintiffs claim that defendants improperly denied their request for PMI abatement, plaintiffs had paid down only approximately 2% of the loan. *See* Defs.' Loan History; Full Loan History, Ex. 29 to Pls.' Opp. (showing principal balance on April 16, 2009 of $274,370.92 on a loan of $280,000). And when Chevy Chase denied the PMI request, plaintiffs were more than 30 days late on their March 2009 payment. *Id.*; *see also* March 2009 Payment Receipt, Ex. 55 to Pls.' Opp. (showing payment made on April 28, 2009); *accord* Defs.' Loan History at 2. Given this, plaintiffs were not entitled to have the PMI requirement removed under the terms of their contract, and they cannot show that defendants did anything to destroy or injure the rights given to them by contract. The fact that Christopher Ihebereme may have *believed* the terms for removal of the PMI requirement to be different does not change this.     *Paul*, 754 A.2d at 311. Finally, plaintiffs only claim, without providing evidence, that defendants miscalculated the amount due for PMI and overcharged plaintiffs. Defendants provide evidence that the PMI payment was calculated correctly. Brunson-Matthews Decl. ¶¶ 10–17. Accordingly, the Court will grant defendants' motion for summary judgment on this count.

## VI.    Fraud Against Plaintiff Christopher Ihebereme Regarding PMI

Plaintiffs further allege with respect to the mortgage's PMI requirements that defendants defrauded Christopher Ihebereme by: refusing to credit three of his payments in a timely

manner, making it difficult for him to pay his mortgage and thereby causing his late payments; and refusing to remove the loan's PMI requirement after admitting to crediting his payments improperly.  2d Am. Compl. ¶ 73.

Defendants assert that the fraud claim is also preempted by FCRA, but even if it is not, the evidence shows that they credited all his payments appropriately except for one which they promptly corrected.  They also assert that they did not make it difficult for him to pay his mortgage or cause his late payments.  And in any event, under the terms of the loan, the loan was not eligible to have the loan's PMI requirement removed.  Defs.' Mot. at 24–26.

The elements of common law fraud are "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation."   *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002), quoting *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977).  A plaintiff claiming fraud must allege specific facts lending themselves to an inference of fraud under both D.C. and federal pleading standards.  Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Bennett*, 377 A.2d at 59-60 ("One pleading fraud must allege such facts as will reveal the existence of all the requisite elements of fraud.").

This claim fails because defendants made no false representation. As explained in the Analysis Section V above, plaintiffs were not eligible to have PMI removed under the agreed terms of the loan.  Accordingly, the claim for fraud will be dismissed with prejudice.

## VII.    D.C. Consumer Protection Procedures Act

Plaintiffs allege that defendants violated the D.C. Consumer Protection Procedures Act. Specifically, they claim that defendants failed to "provide material facts or . . . misrepresented

material facts to the detriment of Plaintiffs" by failing to explain to Christopher Ihebereme the changes to and the reasons for the changes to how he was supposed to pay his mortgage, misrepresenting to credit bureaus and his family that payments on the mortgage were delinquent, refusing to timely credit three payments, failing to tell plaintiffs it was overcharging for PMI, falsely asserting that plaintiffs had not met the requirements to have PMI abated and to remove PMI from the loan, and failing to record the deed for the property in a timely fashion as required by D.C. Code §§ 47-1431(a) and 47-1432.  2d Am. Compl. ¶¶ 76–82, 85–86.  Defendants assert these claims are preempted by FCRA and even if they are not, defendants are entitled to judgment on the pleadings.  Defs.' Mot. at 26–32.

The DCCPPA was enacted to "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices."  *Grayson v. AT&T Corp.*, 15 A.3d 219, 242 (D.C. 2011), citing D.C. Code § 28-3901(b)(2) (one of the purposes of the act is to create a mechanism to remedy "improper trace practices").  The statute defines a "trade practice" as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services."  D.C. Code § 28-3901(a)(6).  The DCCPPA definition of "goods and services" includes "real estate transactions." *DeBerry v. First Gov't Mortg. & Investors Corp.*, 743 A.2d 699, 702 (D.C. 1999).  And it also applies to real estate mortgage finance transactions.  *Id.*  Section 3904 is entitled "unlawful trade practices" and it lists thirty-five acts that are unlawful "whether or not any consumer is in fact misled, deceived or damaged thereby."   The list includes the proscriptions that it is unlawful to "(e) misrepresent as to a material fact which has a tendency to mislead" and "(f) fail to state a material fact if such failure tends to mislead."  D.C. Code § 28-3904(e), (f).

28

**A.     Claim that Defendants Refused to Explain How to Pay the Mortgage and Why the Process for Paying the Mortgage Changed**

As part of their DCCPPA claim, plaintiffs assert that defendants failed to explain to Christopher Ihebereme how to pay his mortgage or why the process for making payments changed.  2d Am. Compl. ¶ 77.  Defendants argue that plaintiffs provide no evidence that the bank changed the way plaintiffs were required to pay the mortgage or that it prevented them from paying online.  Defs. Mot. at 27.  Plaintiffs admit they have no documents to show that the bank changed the process for paying the mortgage, but they blame that on defendants.  Pls.' Opp. at 10 ("In spite of numerous attempts, Plaintiff Christopher has never been able to get information from Chevy Chase or Capital One concerning why his online access was terminated. . . . Even through discovery Defendants have failed and refused to provide that information.").

The parties have had the full benefit of discovery in this case, and although plaintiffs complain in their briefs that they did not obtain the evidence they sought regarding Christopher Ihebereme's online access, they never moved to compel that discovery.  While "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party," *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d at 65, citing *Anderson*, 477 U.S. at 247, plaintiffs may not rest on the mere allegations or denials of its pleadings but must instead establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252.  The only evidence the Court has before it on this issue is Christopher Ihebereme's own testimony.  The Court doubts that this allegation constitutes an unlawful trade practice under § 28-3904(f), but in any event, plaintiffs have not come forward with specific facts showing that there is any genuine issue for trial concerning the online access issue.

**B.**     **Claim regarding Misrepresentations to Credit Bureaus and Christopher Ihebereme's Family that The Mortgage was Delinquent**

Plaintiffs next allege that defendants violated the DCCPPA by disseminating false information to credit bureaus and to his family about the mortgage.  Part of this claim relates to reports to credit bureaus, which is preempted by FCRA, so that portion of the claim will be dismissed with prejudice.  *See supra* Analysis Section I.  As for the alleged misrepresentations to his family, the evidence shows that the only letters sent regarding the mortgage were specifically addressed to the plaintiffs, not to "Occupant," as plaintiffs allege, so there were no statements made to Christopher Ihebereme's family.[8]   Moreover, the evidence shows that the letters were accurate.  Even if the letters were generated because the bank had not yet credited the February 25, 2009 payment by mistake, had the bank credited that payment on February 25, 2009, *the payment was still late*.  Thus, there is no misleading misrepresentation in the letters the bank sent to plaintiffs.[9]

---

[8]     Defendants argue that this claim should fail because plaintiffs' cannot prove the elements for fraudulent misrepresentation, including intent to deceive.  Defs.' Mot. at 28.  The Court of Appeals for the District of Columbia has held, however, that a person bringing suit under Sections 28-3904(e) and (f) for misrepresentation do not need to allege or prove intentional misrepresentation or failure to disclose.  *Grayson v. AT&T Corp.*, 15 A.3d 219, 251 (D.C. 2011).

[9]     Plaintiffs also attach a letter dated March 3, 2008 to the opposition brief.  Letter from Collection Department, Chevy Chase Bank (March 8, 2008), Ex. 5 to Pls.' Opp.  The record shows that payments before then were made within the grace period.  *See* Full Loan History, Ex. 44–50 to Pls.' Opp.  But that letter does not appear to be the basis for the alleged estrangement that underlies this claim, because Christopher Ihebereme did not become estranged from his wife and plaintiff Chidozie until a year later in the spring of 2009.  2d Am. Compl. ¶ 95.  More important, that letter was not sent to anyone other than the mortgagees either.

### C.      Claim regarding Refusing to Credit Payments Timely

Plaintiffs allege that defendants violated the DCCPPA by refusing to timely credit the three payments.  2d Am. Compl. ¶ 79.  Defendants argue that a delay in timely crediting payments is not a material misrepresentation or a trade practice under the DCCPPA and that plaintiffs cannot prove the requisite damages.  Defs.' Mot. at 29.  Plaintiffs have not identified a catetory in section 3904 that would embrace this allegation, and defendants are correct that crediting payments to the mortgage does not constitute a trade act under the statute.  The DCCPPA defines a trade practice to mean "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services."  D.C. Code § 28-3901(a)(6).  Furthermore, as explained above in Section IVB, the evidence shows that although defendants mistakenly credited the February 2009 on March 19, 2009 instead of on February 25, 2009, they corrected that error.  Brunson-Mathews Decl. ¶ 23; Correcting Letter. And there is no evidence showing that the bank delayed crediting the December 2008 or January 2009 payments.

### D.      Claim regarding Misrepresentations about PMI and Failing to Remove PMI

As explained above, plaintiffs were not entitled to have the PMI requirement removed from their loan.  *See supra* Analysis Section V.  Given, this, plaintiffs cannot allege any misrepresentations regarding PMI, and defendants did not improperly fail to remove PMI from their loan.

### E.      Claim regarding Failing to Record the Deed in a Timely Fashion

Plaintiffs claim, "[u]pon information and belief," that defendants did not record the mortgage and deed in the time required by DC Code § 47-1431(a), which they assert violates the

DCCPPA.   2d. Am. Compl. ¶¶ 85–86.   D.C. Code § 47-1431(a) requires deeds of trust to be recorded within 30 days of execution.   Plaintiffs present no evidence to support their belief, however.   Defendants assert that they recorded the deed timely on April 11, 2007, citing to the Deed of Trust attached to their motion.   Defs.' Mot. at 30, citing Ex. C.   The Court cannot discern from the face of the Deed of Trust when it was recorded, but it is plaintiffs' burden to come forward with evidence supporting their claims.

Defendants also argue that a failure to record a deed of trust within the time required under section 47-1431(a) is not a violation of the DCCPPA.   Plaintiffs concede they have found no case law addressing the issue of the remedy when a lender fails to file a deed in a timely manner.   Pls.' Opp. at 24 n.9.   Likewise, the Court has found no case law holding that failure to record a deed timely under section 47-1431(a) violates the DCCPPA.   It does note, however, that section 47-1431(a) does not "expressly confer a private right of action; rather, violators of the statute face only a monetary fine."   *See Koker v. Aurora Loan Servicing, LLC*, No. 12-1069, 2013 WL 40320, at *7 (D.D.C. Jan. 3, 2013), citing D.C. Code § 47-1433(c).   Plaintiffs here try to create a private right of action by using the DCCPPA to remedy an alleged violation of section 47-1431(a).   But the recordation statute's express terms do not support that reading, nor do the terms of the the DCCPPA.   The DCCPPA makes it a violation of the act for any person to "violate any provision" of several statutes.   *See* D.C. Code § 28-3904(w)–(hh) (making it a violation of the DCCPPA to violate, among other enumerated statutes, the District of Columbia Consumer LayAway Plan Act, § 28-3904(y), the Rental Housing Locator Consumer Protection Act of 1979, § 28-3904(z), and the Real Property Credit Line Deed of Trust Act of 1987, § 28-3904(cc)).   But the DCCPPA conspicuously does not mention D.C. Code § 47-1431.   Given that the recordation statute does not provide for a private right of action and the DCCPPA does

not include the recordation statute among those statutes that can create a violation of the DCCPPA, the Court finds no basis to conclude that a violation of section 47-1431 constitutes a violation of the DCCPPA. Accordingly, there is no claim under the DCCPPA even if defendants had recorded the deed late.

For these reasons, defendants' motion for summary judgment on the DCCPPA claims will be granted.

## VIII.   Claim of Promissory Estoppel

Plaintiffs claim that defendants should be estopped from promising to remove false information about the mortgage from credit reports and failing to do so. 2d Am. Compl. ¶¶ 98–103. That portion of this claim that relates to defendants' reports to credit bureaus is preempted by FCRA, *see supra* Analysis Section I, and the Court will dismiss that portion of the claim. They also allege that defendants refused to relieve them of the PMI requirement as promised. 2d Am. Compl. ¶¶ 104–06.

"Promissory estoppel is recognized in the law of the District of Columbia as a theory allowing recovery in contract when there may have been a failure of proof of certain elements necessary to the formation of an express contract . . . if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice." *Fed. Ins. Co. v. Thomas W. Perry, Inc.*, 634 F. Supp. 349, 352–53 (D.D.C. 1986). To allege promissory estoppel, a plaintiff must establish (1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his detriment. *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 71 (D.D.C. 2005). A plaintiff cannot make a claim for promissory estoppel if a written contract governing the alleged promise exists. *Id.* ("District of Columbia law presupposes that an express, enforceable contract is *absent* when the doctrine of

promissory estoppel is applied.") (emphasis added) (internal quotations omitted).  Here, there is no dispute that the parties had a written contract governing the requirements for PMI. Addendum to Loan Application.  And under terms of that contract, plaintiffs were ineligible to have the PMI requirement removed from their loan.  *See supra* Analysis Section V.  So defendants' motion for summary judgment will be granted with respect to that portion of this claim, and this count fails.

## IX.     Homeowners Protection Act

Plaintiffs alleged that defendants' failure to remove PMI from the mortgage violates the Homeowners Protection Act, 12 U.S.C. § 4909.  2d Am. Compl. ¶¶ 108–10.  Defendants argue that they are entitled to summary judgment or judgment on the pleadings because the claim relies on plaintiffs' incorrect allegation that they were entitled to PMI abatement.  Defs.' Mot. at 33.

The Homeowners Protection Act, 12 U.S.C. §§ 4901–4910, sets forth requirements about private mortgage insurance, including requirements governing termination of PMI, § 4902, disclosure of PMI requirements, § 4903, and enforcement of the Act, § 4909.  The act states that PMI must be cancelled when a borrower, "(1) submits a request in writing to the servicer that cancellation be initiated; (2) has a good payment history with respect to the residential mortgage; (3) is current on the payments required by the terms of the residential mortgage transaction;" and (4) can show that the value of the property has not declined below its original value and is not encumbered by a subordinate lien.  § 4902.  It also provides that PMI automatically terminates when the loan value reaches 80 percent of the loan.  § 4901(2).

The undisputed facts show that plaintiffs were not eligible to have the PMI requirement removed from the loan under the contract.  *See supra* Analysis Section V.  Accordingly, defendants' motion for summary judgment on this count will be granted.

X.      **Fair Credit Reporting Act**

Plaintiffs claim that defendants violated Section 623 of FCRA by providing false statements to credit bureaus, failing to provide accurate information, and failing to correct inaccurate information.  2d Am. Compl. ¶¶ 113–14.  Defendants contend they are entitled to judgment on the pleadings or summary judgment because there is no private right of action under FCRA and because the facts do not satisfy the requirements for a Section 623 violation.  Defs.' Mot. at 34–36.

FCRA was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  Section 623(a) and (b) of FCRA impose two sets of obligations on those who furnish credit information to consumer reporting agencies.  15 U.S.C. § 1681s-2.  Subsection (a) requires "furnishers of information" to provide accurate information to consumer reporting agencies and to correct and update that information.  15 U.S.C. § 1681s-2(a)(1)–(2).[10]  Subsection (a) is "enforced exclusively as provided under section 1681s [Section 621] by the Federal agencies and officials and the State officials identified in section 1681s."  15 U.S.C. § 1681s-2(d).  Thus, there is no private right of action under Section 623(a), meaning an individual cannot sue to enforce that provision.  *Mazza v. Verizon Wash. DC, Inc.*, 852 F. Supp. 2d 28, 34 (D.D.C. 2012); *see also Haynes*, 825 F. Supp. 2d at 295.  Plaintiffs, therefore, cannot bring a claim for a violation of

---

10      The parties do not dispute that defendants are furnishers of information under FCRA. "[T]he most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies."  *Himmelstein v. Comcast of the Dist., L.L.C.*, No. 12-1475 (JEB), 2013 WL 1137048, at *3 (D.D.C. Mar. 20, 2013, quoting *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 35 n. 7 (1st Cir. 2010).

Section 623(a), and the Court will dismiss this count with prejudice to the extent it seeks to state a claim under FCRA's Section 623(a).

Subsection (b) governs what furnishers of information must do upon notice of a dispute from a consumer.  A furnisher incurs additional duties if, *pursuant to § 1681i(a)(1)*, a consumer disputes the accuracy of information that the furnisher reports.  *Himmelstein v. Comcast of the Dist., L.L.C.*, No. 12-1475 (JEB), 2013 WL 1137048, at *3 (D.D.C. March 20, 2013 (NO. CIV.A. 12-1475 JEB)), citing *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008).  Section 1681i(a)(1) requires a consumer reporting agency to conduct an investigation "if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer *and the consumer notifies the agency directly, or indirectly through a reseller*."[11]   15 U.S.C. § 1681i(a)(1)(A) (emphasis added).  If a consumer notifies a consumer reporting agency that he disputes the accuracy of an item in his file, FCRA requires the agency to notify the furnisher of the dispute.  *Himmelstein*, 2013 WL 1137048, at *5, citing 15 U.S.C. § 1681i(a)(2).  Once notified, the furnisher has duties under FCRA to investigate the disputed information and correct it as necessary.  15 U.S.C. § 1681s-2(b)(1).

Although plaintiffs allege that defendants made "false and misleading and inaccurate statements" to credit reporting agencies, they do not allege that they ever reported this inaccuracy to any credit reporting agency pursuant to section 1681i(a)(1).  Thus, they have not

---

11     A "reseller" under FCRA is a consumer reporting agency that assembles and merges information from another consumer reporting agency or multiple agencies to sell to third parties. 15 U.S.C. § 1681a(u).

stated a claim that defendants violated 15 U.S.C. § 1681s-2(b).  The Court will dismiss this count

with prejudice to the extent it seeks to state a claim under FCRA's Section 623(b).

## CONCLUSION

For the reasons explained above, defendants' motion for summary judgment and

alternative motion for judgment on the pleadings is granted.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE:  March 28, 2013